**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 08a0567n.06
Filed: September 18, 2008

**No. 07-1953**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| JULIE OLDEN; RICHARD HUNTER; WILBUR BLEAU; et al., | ) | |
| | ) | |
| Plaintiffs-Objectors-Appellants, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN |
| | ) | |
| CARL GARDNER; CLARA LEWANDOWSKI; RONALD MCLENAN, SR., | ) | |
| | ) | |
| Plaintiffs-Appellees, | ) | |
| | ) | |
| LAFARGE CORPORATION, | ) | |
| | ) | |
| Defendant-Appellee. | ) | |

**Before: ROGERS and MCKEAGUE, Circuit Judges; and ADAMS, District Judge.** [*]

**Rogers, Circuit Judge.** The appellants in this case are some members of a class of plaintiffs

who sued the defendant, Lafarge Corporation, because of pollution emitted by its portland cement

plant in Alpena, Michigan. After the defendants had unsuccessfully appealed the district court's

class certification decision, the class counsel and the defendant entered into settlement negotiations.

The class counsel and defendants came to an agreement whereby the defendant would pay the class

---

[*]The Honorable John. R. Adams, United States District Judge for the Northern District of Ohio, sitting by designation.

members $1,900,000, while also spending $700,000 on capital improvements to reduce pollution.

The appellants (hereinafter, the "Objectors") objected to this proposed settlement and asked the

district court to reject it. In turn, the class counsel asked the court to remove the class representatives

— who all objected to the settlement — and replace them with new class representatives. The

district court granted the motion to substitute new class representatives, although the court refused

to approve the settlement because it impermissibly required those who had previously opted out of

the litigation to do so again. Soon after the rejection of the first proposed settlement agreement, the

parties submitted a revised settlement agreement that resolved the opt-out issue, but was otherwise

substantially identical to the first settlement agreement. The Objectors filed objections yet again,

but the district court overruled those objections and approved the settlement. On appeal, the

Objectors contend that the revised settlement agreement should not have been approved because it

is not fair, reasonable, and adequate. They also argue that the original class representatives should

not have been removed as class representatives, and that the district court should have awarded fees

and costs to Objectors' counsel. Although the fairness, reasonableness, and adequacy of the

settlement is a close call, and this court might not approve the settlement if it were evaluating the

issue de novo, the highly deferential standard of review requires affirmance of the district court's

decision to approve the settlement. Likewise, the district court's decisions to replace the original

class representatives and deny fees and costs to the Objectors' counsel must also be affirmed.

I.

The cement plant in question manufactures cement from limestone, sand, fly ash, gypsum, and iron. These raw materials are blended together after having been dried and ground into powder. Afterward, the mixture is heated to a high temperature in kilns fueled by coal and petroleum coke. This transforms the mixture into hard nodules called clinker. After the clinker is cooled and ground into powder, it is combined with gypsum to produce cement. This process results in the release of substantial amounts of particulate into the air. Some of this pollution is composed of toxic substances, such as mercury.

In 1994, Lafarge entered into a consent judgment with the State of Michigan concerning the plant's pollution. Nevertheless, the plant continued emitting pollution. Between 1996 and 1999, the Michigan Department of Environmental Quality ("MDEQ") determined that the plant committed numerous violations of the consent judgment that resulted in stipulated penalties of $5.4 million. These penalties do not appear to have stopped the pollution though. In 2005 — six years after this lawsuit was filed — the plant emitted 802,119 pounds of EPA Toxic Release Inventory air pollutants. The plant also emitted high levels of mercury during that year. According to MDEQ, the plant emitted 520 pounds of mercury into the air during 2005, and Lafarge's own monitoring shows that the plant emitted between 422 and 555 pounds of mercury during that year. MDEQ records indicate that this was the second largest source of mercury emissions in Michigan in 2005. Of the mercury emitted from the plant, approximately 85%-90% was in the oxidized gaseous form, which, according to the affidavit of the Objectors' expert, was especially harmful because it is water soluble and therefore "much more biologically available for toxic action." The Objectors' expert

has also attested to the fact that oxidized mercury not only has more dangerous properties than other forms of mercury, but is a particular concern for the resident of Alpena because it is deposited closer to its source than other forms of mercury.

On April 19, 1999, a putative class action complaint was filed against Lafarge. The complaint named Julie Olden, Richard Hunter, and Wilbur Bleau as the putative class representatives, and it alleged four causes of action: (1) a medical monitoring claim; (2) trespass; (3) nuisance; and (4) negligence.[2] The class alleged that they had suffered personal injury and property damage as a result of the cement kiln dust that was produced and emitted during the manufacturing process. The class also claimed to have suffered similar injuries due to the emission of toxic by-products that resulted from the burning of hazardous waste in the kilns.

On October 24, 2001, the case was certified as a class action. *See Olden v. Lafarge Corp.*, 203 F.R.D. 254 (E.D. Mich. 2001). The class was defined as "all owners of single family residences in the City of Alpena whose persons or property was damaged by toxic pollutants and contaminants which originated from the LaFarge [sic] cement manufacturing facility located in Alpena, Michigan." *Id.* at 271. The class certification was appealed to the Sixth Circuit. Before the appeal was heard, however, the two parties went to mediation. The mediator — who was a former chief judge of the Wayne County (Michigan) Circuit Court — concluded that a settlement of $1.8 million would be fair and reasonable. Nevertheless, the parties were not able to come to an agreement, and the appeals process continued. The class certification decision was affirmed by the Sixth Circuit in *Olden v.*

---

[2]The medical monitoring and trespass claims were eventually dismissed.

*Lafarge Corp.*, 383 F.3d 495 (6th Cir. 2004), and the Supreme Court denied certiorari in *Lafarge*

*Corp. v. Olden*, 545 U.S. 1152 (2005).

Almost immediately after the Supreme Court's denial of certiorari, the parties entered into

settlement negotiations. The class counsel had no expert opinions, nor had they engaged in formal

discovery. Nevertheless, the class counsel — who had been involved in many environmental class

actions, but had never taken one to trial — reached a proposed settlement with Lafarge. The

proposed settlement agreement called for a total settlement value of $2.6 million, and it redefined

the class as:

> All of those natural persons residing within the City of Alpena, Michigan, at any time
> between April 19, 1996, and the date of this Agreement, together with all of those
> natural persons or entities (including but not limited to proprietorships,
> unincorporated associations, partnerships, institutions, business and professional
> corporations, not-for-profit corporations, trusts, and their successors in title or
> interest) owning residential property within the City of Alpena, Michigan, at any time
> between April 19, 1996, and the date of this Agreement.

In consideration for this settlement, the class members were required to release all claims against

Lafarge relating to any alleged emissions from Lafarge's Alpena plant that were, or could have been,

pleaded in the instant case. This release was to cover all damages or injuries — whether known or

unknown — except for "those claims of alleged personal injuries that were brought to the attention

of a health care provider by way of a personal visit prior to the date of this Agreement where either

the class member or the health care provider asserted, at the time of the visit, a causal connection

between the injury and an emission from the Defendant's plant."

Of the $2.6 million settlement amount, Lafarge was to spend $700,000 on two capital improvement projects: (1) upgrading the plant's dust collection system, and (2) paving a parking lot and road at the facility. The remaining $1.9 million of the settlement was to constitute the Settlement Fund.

From the Settlement Fund would be paid the attorneys' fees and costs, the class representatives' banner awards, and the compensation to class members who submitted claims. Having top priority were the fees and costs sought by the class counsel, which amounted to nearly $670,000. Next, the class representatives would be paid banner awards of $20,000 each. Finally, the remaining money would be paid to members of the settlement class who submitted a claim. The proposed settlement agreement established a formula for determining how much these individuals would recover. Their claims would be based on their "recognized claim." A claimant's recognized claim was to be determined according to the location of their residence, whether they owned their residence, and the portion of the class period during which they owned or resided in their residence. The recognized claim for a claimant who both resided in and owned a "Qualifying Residence"[3] throughout the class period was assumed to have a value of $1,000.[4] If, throughout the class period,

---

[3]"Qualifying Residence" was defined as: "(i) the primary residence in the City of Alpena occupied by a Claimant and any members of his or her household during the Class Period; or (ii) residential property owned by a Claimant."

[4]It seems as though the intent was to establish a baseline assumed value of $1,000 for all claims. Otherwise, there would be no way to determine the value of the recognized claim for those people who did not both reside in *and* own a Qualifying Residence since the proposed settlement agreement does not establish an assumed value for people in that situation. Nevertheless, the plain language of the agreement does not reflect the probable intent.

a claimant resided in and owned a Qualifying Residence that was outside the North Side Geographic Area ("NSGA"),[5] then the claimant's recognized claim would be 100% of the assumed value of the claim. *See id.* If, throughout the class period, a claimant owned a Qualifying Residence that was outside the NSGA, but the claimant did not reside in the residence, then the claimant's recognized claim would be 50% of the assumed value of the claim.[6] Likewise, a claimant would receive 50% of the assumed value of their claim if, throughout the claim period, the claimant resided in a Qualifying Residence that was outside the NSGA but did not own the residence.[7] If a claimant lived in or owned a Qualifying Residence in the NSGA, then the claimant would receive twice the amount that the claimant would receive if the Qualifying Residence were not in the NSGA. Finally, if a claimant lived in or owned a Qualifying Residence for less than the entire class period, the claimant's recognized claim would be reduced according to the proportion of days spent residing in or owning a Qualifying Residence during the class period to the total number of days in the class period.

---

[5]The "North Side Geographic Area" was defined as "the geographic area defined by drawing a line from Lake Huron along the northeast side of the Thunder Bay River to the east of the railroad track that crosses the Thunder Bay River near 10th Street continuing on the track northeasterly to Long Lake Road following the track thereafter southeasterly to Wessel and then southerly along Wessel extending on a line through Ford Avenue to Lake Huron." This represents the portion of Alpena in closest proximity to the Lafarge cement plant.

[6]As mentioned above in note 2, the proposed settlement agreement provided no mechanism for determining the assumed value of a claim made by a person who did not both reside in and own a Qualifying Residence throughout the class period. Therefore, interpreting the agreement literally, it is not possible to determine the assumed value of a claim made by a claimant who did not both own and reside in a Qualifying Residence.

[7]*See supra* note 4.

According to affidavits submitted to the district court, none of the class representatives were invited to participate in the settlement negotiations or even notified that such negotiations were taking place. Two of the original class representatives — Bleau and Hunter — say that they were not shown a copy of the proposed settlement agreement until after it had been submitted to the district court. Hunter says that he was first informed of the proposed settlement by class counsel in May of 2006. He further says that he was told that each of the class representatives would receive $5,000, but that the mercury emissions would not be remedied by the settlement. In response, Hunter informed the class counsel that the class representative's award was not enough, and that the settlement needed to resolve the underlying pollution issues. Hunter says that the class counsel informed Hunter that the mercury problem was not the class counsels' issue.

The third class representative, Olden, says that the class counsel initially informed her that each class representative would receive $5,000, but that the amount was eventually raised to $20,000 each after she expressed disapproval of the settlement. She also says that she was shown the proposed settlement agreement prior to its submission to the district court and that the class counsel told her that the proposed settlement agreement would not be sent to the other class representatives because it did not have to be sent to them. In addition, she says that the class counsel told her that she should take the lead on the settlement for the good of the community, and that she signed the proposed settlement agreement without really understanding what she was doing.

When the proposed settlement agreement was submitted to the district court for preliminary approval on June 20, 2006, it bore the signature of only one class representative, Julie Olden. On

June 28, 2006, the district court preliminarily approved the proposed settlement. In doing so, it ordered that the class be redefined according to the definition provided in the proposed settlement agreement, and it also concluded that the proposed settlement appeared "to be a fair result of arms length negotiation that is likely to be in the best interest of [the] class members." Shortly after this preliminary approval, class representative Olden revoked her signature and her approval of the proposed settlement. Additionally, class representatives Hunter and Bleau made a complaint against the class counsel to the Michigan Attorney Grievance Commission.

On August 7, 2006, attorney Christopher M. Bzdok made an entry of appearance on behalf of the class representatives and 79 other class members. Bzdok simultaneously filed objections to the proposed settlement agreement on behalf of those 82 individuals. These objections argued that the proposed settlement agreement was unfair for seven reasons: (1) the settlement agreement did not have the endorsement of any of the class representatives; (2) class counsel had not obtained any expert opinions or engaged in formal discovery before negotiating the settlement; (3) the settlement would, for minimal or no consideration, release all claims, even personal injury claims that had not yet accrued; (4) the settlement arbitrarily expanded the class from people actually damaged by Lafarge's emissions to everyone in the City of Alpena; (5) the proposed settlement agreement forced back into the class all class members who had previously opted out of the litigation and required them to opt out again if they did not want to be part of the settlement; (6) the deadline to object to the settlement was the same as the deadline to opt out; and (7) there was no justification given for the requested attorneys' fees.

At the same time that the objections were being lodged, the class counsel were seeking to replace the class representatives. On August 7, 2006, the class counsel filed a motion seeking to withdraw as counsel for the original class representatives, and to remove Olden, Hunter, and Bleau as class representatives and replace them with Carl Gardner, Clara Lewandowski, and Roland L. McLennan. The class counsel argued that it was necessary to replace the class representatives because their objections to the proposed settlement had "rendered them inadequate representatives of the Class . . . ." The class counsel also alleged that the attorney-client relationship had deteriorated to a point where they could no longer represent the class representatives. In support of this argument, the class counsel pointed to the class representatives' demands for more money, their voicing of disapproval of the settlement in the local media, and Hunter's and Bleau's act of filing a complaint with the Michigan Attorney Grievance Commission.

In an opinion and order issued on January 29, 2007, the district court addressed the objections and the class counsels' motion to replace the class representatives. The district court overruled all but the fifth objection — i.e., that the settlement impermissibly forced back into the class those who had already opted out of the litigation. *See Olden v. Lafarge Corp.*, 472 F. Supp. 2d 922, 940 (E.D. Mich. 2007). As to the other six objections, the district found no problems. In overruling these objections, the district court reasoned that: (1) the disapproval of the original class representatives was not a sufficient reason for rejecting the settlement because the class counsels' obligations ran to the class as a whole rather than the class representatives; (2) through informal discovery, the class counsel conducted sufficient investigation of the claims to prepare the case for trial or settlement;

(3) considering the significant possibility that the plaintiff class would lose at trial, a $2.6 million settlement was not insufficient consideration for the release of the class members' claims; (4) the redefinition of the class to include all residents of Alpena resulted in a superior class definition because it provided more objective criteria for identifying class members; (5) the class members' due process rights were not violated by the fact that the deadlines to object to the settlement and to opt out of the litigation were the same; and (6) the objection to the class counsels' request for fees and costs was premature because such a request had not yet been made. *See id.* at 931-36. Despite overruling six of the seven objections, the district court concluded that the entire settlement must be rejected because of the unacceptable opt-out provision. *See id.* at 936-37. Although it refused to approve the settlement, the district court did grant the class counsels' motion to substitute Gardner, Lewandowski, and McLennan as the class representatives. *See id.* at 939.

After the rejection of the first proposed settlement agreement, the class counsel and the defendant went back to the drawing board. On March 12, 2007, they jointly moved for preliminary approval of an amended settlement agreement. The amended settlement agreement remedied the opt-out problem that had sunk the previously proposed agreement, and it also reduced the class representatives' banner award from $20,000 each to $2,500 each. Other than these changes, the amended settlement agreement was virtually identical to the original. The district court preliminarily approved the amended settlement agreement on April 6, 2007. On May 29, 2007, Olden, Bleau, Hunter, and 67 other individuals renewed their objections and requested attorney's fees and costs. Along with their objections, they submitted an affidavit from Alexander J. Sagady, an expert whom

they had retained for the purpose of demonstrating that there were serious environmental and health risks that were not addressed by the amended settlement agreement. On June 12, 2007, the district court granted final approval for the amended settlement agreement. *See Gardner v. Lafarge Corp.*, No. 99-10176, 2007 WL 1695609 (E.D. Mich. June 12, 2007). In its opinion, the district court also rejected Bzdok's request for attorney's fees because the district court found that his "work did not produce a beneficial result for the class." *See id.* at *7. In upholding the settlement, the district court rejected the objections on the basis of the reasoning contained in its earlier opinion. *See id.* at *6-*7.

On July 6, 2007, a notice of appeal was filed on behalf of 64 objectors. At this point, however, only 57 objectors (i.e., the "Objectors") are still involved in the case. On appeal, the Objectors contest the fairness of the settlement, and they also argue that the original class representatives should not have been replaced, and that the district court should not have denied their counsel's request for attorney's fees and costs. With respect to the fairness of the settlement, the Objectors argue that the amended settlement agreement should have been rejected because: (1) it provided insufficient consideration for an overly broad release of claims against Lafarge; (2) the class counsel negotiated the settlement without having the benefit of expert opinions or formal discovery; (3) the amended settlement agreement was disapproved by the original class representatives and many other class members; and (4) the risks of trial did not weigh in favor of the settlement.

II.

Before approving a class action settlement, a district court must conclude that the settlement is "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2). A district court's decision in this regard is reviewed for abuse of discretion. *See UAW v. Gen. Motors Corp.*, 497 F.3d 615, 625 (6th Cir. 2007). In evaluating the fairness of a settlement, this court considers these factors:

> (1) the risk of fraud or collusion; (2) the complexity, expense and likely duration of the litigation; (3) the amount of discovery engaged in by the parties; (4) the likelihood of success on the merits; (5) the opinions of class counsel and class representatives; (6) the reaction of absent class members; and (7) the public interest.

*Id.* at 631 (citing *Granada Invs., Inc. v. DWG Corp.*, 962 F.2d 1203, 1205 (6th Cir. 1992); *Williams v. Vukovich*, 720 F.2d 909, 922-23 (6th Cir. 1983)). Some of these considerations support the settlement agreement at issue, and some do not. While some of the relevant factors certainly weigh against approving the settlement, it cannot be said that the settlement agreement is unfair, unreasonable, or inadequate, given the deference owed to the district court.

Weighing in favor of the settlement are the second, fourth, and sixth factors — i.e., the complexity, expense, and likely duration of the litigation; the lack of great likelihood of success on the merits; and the reaction of absent class members. First, the complexity, expense, and likely duration of the litigation weigh in favor of the settlement because, if this case had gone to trial, it most likely would have been a lengthy proceeding involving complex scientific proof. The experts necessary to present — and defendant against — such proof would undoubtedly have been expensive

for both sides. Following the trial, there would most likely have been an appeal that would have required an additional investment of substantial resources and time. These considerations suggest that settling the case was an efficient and reasonable decision.

In addition, the reaction of absent class members — i.e., those class members other than the class representatives — cuts in favor of the settlement agreement as well. Out of nearly 11,000 absent class members, only 79 objected to the settlement, and only 54 are involved in this appeal. Although this is not clear evidence of class-wide approval of the settlement, it does permit the inference that most of the class members had no qualms with it. This tends to support a finding that the settlement is fair.

Further, the plaintiff class's likelihood of success on the merits does not appear to have been especially good. It would have been difficult to prove that any injuries suffered by the class members were caused by the Lafarge plant rather than one of several other industrial facilities in the area. It is difficult, though, to evaluate the likelihood of success on the merits in light of the class counsels' failure, as discussed below, to conduct any discovery or obtain expert opinions on the issues of causation, negligence, or damages. Thus, while this factor weighs in favor of the settlement, it does so only marginally.

Counseling against the settlement, on the other hand, are the first, third, fifth, and seventh factors — i.e., the risk of fraud or collusion; the limited amount of discovery engaged in by the parties; the opinions of the original class representatives; and the public interest.

The factor that weighs against the settlement most heavily is the limited amount of discovery engaged in by the parties. In this case, the class counsel negotiated the settlement agreement without first obtaining any expert opinions or engaging in formal discovery. Obtaining expert opinions and engaging in formal discovery are usually essential to establishing a level playing field in the settlement arena because it enables the class counsel to develop the merits of their case. *See In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liability Litig.*, 55 F.3d 768, 813-14 (3d Cir. 1995). Indeed, without expert opinions or formal discovery, the class counsel could not have had much — if any — evidence on the issues of causation, negligence, or damages. Without such evidence, the class counsel could not have entered into the settlement negotiations with much more than an uneducated guess as to the merits of the case and the propriety and fair value of a settlement. This undoubtedly weakened the class counsels' ability to advocate effectively for the plaintiff class during settlement negotiations and therefore suggests that the settlement was not fair, reasonable, and adequate. *Cf. In re Corrugated Container Antitrust Litig.*, 643 F.2d 195, 211 (5th Cir. 1981) ("Of course, if the record points unmistakably toward the conclusion that the settlement was the product of uneducated guesswork, a court may be acting within its discretion in disapproving the agreement without ever considering whether the agreement's terms are adequate."). Moreover, the failure to obtain such evidence likely weakened the bargaining position of the class counsel since their lack of preparation for trial would have prevented them from using "the threat of litigation to press for a better offer." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1021 (9th Cir. 1998) (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 621 (1997)). Although formal discovery and expert opinions are not necessary conditions for the approval of a settlement, *see In re Corrugated*

*Container Antitrust Litig.*, 643 F.2d at 211, their absence in this case suggests that class counsel may not have obtained the best agreement possible for the plaintiff class.

It is true that the class counsel in this case acquired substantial amounts of information through informal discovery methods, such as FOIA requests, but this information did not provide much information on which to negotiate a settlement. Although the information provided significant documentation of Lafarge's pollution of the environment around Alpena, it provided virtually no evidence on the issues of causation, negligence, or damages. It is true that a Public Health Assessment conducted by the Agency for Toxic Substances and Disease Registry touched on the issue of causation. However, that report did not support the plaintiffs' claims. Therefore, the class counsel would have been well advised to seek another expert opinion to counter-balance the Public Health Assessment. Ironically, the only expert to offer an opinion on behalf of any of the plaintiffs was Alexander J. Sagady, who was retained by the Objectors. Sagady reviewed the publicly available information and opined that, in the absence of a Multi-Pathway Risk Assessment, one would have to assume that the Lafarge plant's mercury emissions presented a significant public health concern.

The class counsel suggest that this court should defer to the class counsels' belief that they had sufficiently investigated their claims to allow for fair settlement negotiations, but the circumstances of this case do not provide much of a basis for deference. Under ordinary conditions, this court "should defer to the judgment of experienced counsel who has competently evaluated the strength of his proofs." *Williams v. Vukovich*, 720 F.2d 909, 922-23 (6th Cir. 1983) (citing *Stotts*

*v. Memphis Fire Dept.*, 679 F.2d 541, 554 (6th Cir. 1982); *Cotton v. Hinton*, 559 F.2d 1326, 1330 (5th Cir. 1977); *Flinn v. FMC Corp.*, 528 F.2d 1169, 1173 (4th Cir. 1975)).  However, "the deference afforded counsel should correspond to the amount of discovery completed and the character of the evidence uncovered." *Id.* at 923 (citing *Flinn*, 528 F.2d at 1173; *Women's Comm. v. Nat'l Broad. Co.*, 76 F.R.D. 173, 176 (S.D.N.Y. 1977)).  Because the class counsel conducted virtually no discovery related to the crucial issues of causation, negligence, and damages, their arguments are entitled to little deference.

Further militating against the settlement is the risk of collusion.  The specter of collusion between the class counsel and Lafarge is present here, just as it is "in every situation where class counsel is allowed to prosecute an action and negotiate settlement terms without meaningful oversight by the class representative." *In re Cal. Micro Devices Sec. Litig.*, 168 F.R.D. 257, 262 (N.D. Cal. 1996).  In this case, the original class representatives provided no meaningful oversight of the class counsel during the settlement negotiations.  In fact, the evidence indicates that the original class representatives were not even aware of the negotiations until after they had concluded.  Although there is no direct evidence of any collusion, the issue is raised by the original class representatives' complete lack of involvement in the settlement process and their corresponding inability to oversee the class counsel.  On the other hand, the possibility of collusion is called into question by the fact that an experienced mediator concluded prior to the settlement negotiations that a fair settlement would involve a total value of $1.8 million, which is $800,000 less than the settlement value eventually agreed upon.  The mediator's recommendation, however, does not

completely eliminate the possibility that there was collusion, because it is not clear why the mediator considered that to be a fair settlement value. Therefore, the risk of collusion weighs against the settlement, albeit only marginally.

Also weighing against the settlement is the opinion of the original class representatives, which is decidedly negative. One could argue that the opinion of the original class representatives is cancelled out by the positive opinion of the class counsel, but, as explained above, the class counsels' failure to conduct discovery on critical issues diminishes the deference that is owed to their opinion.

The public interest also appears to counsel against the settlement. The settlement agreement does not entirely comport with the public interest since it does not address the most significant environmental hazards created by the Lafarge plant, such as mercury emissions. However, this only slightly weighs against the settlement. Settlements are compromises, and therefore, plaintiffs cannot get everything they want.

Finally, the Objectors also argue that the settlement is unfair because it requires an overly broad release of claims on the part of the class members. This objection is not well taken. Like any other settlement, this one requires the plaintiffs to release their claims against the defendant. The release covers all claims against Lafarge — even those that were unknown or had not accrued at the time of settlement — relating to any alleged emissions from Lafarge's Alpena plant that were, or could have been, pleaded in the instant case. Specifically, the release covers claims based on

"alleged airborne pollution, emissions, releases, spills and discharges, exposure to hazardous substances, air contaminants, toxic pollutants, particulate, or odors [emanating from the Alpena plant]." Because such claims have an identical factual predicate as the claims pled in the complaint, no problem is posed by their release. *See Williams v. Gen. Elec. Capital Auto Lease, Inc.*, 159 F.3d 266, 273-74 (7th Cir. 1998) (quoting *Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1287 (9th Cir. 1992)). Therefore, the release does not call for a finding of unfairness.[8]

Evaluating all of these factors together, it is a close call as to whether the district court should have approved the settlement agreement. The district court is much nearer to this case than we are, and where the balance is close, we cannot say that the district court abused its discretion in finding the settlement to be fair, reasonable, and adequate.

### III.

Although we ultimately conclude that the district court did not abuse its discretion in replacing the original class representatives, this is a close question in this case and we may well have made a different decision if we were the trial judges. Replacing class representatives for objecting to a proposed settlement appears inconsistent with the theory of class representatives. Class representatives are expected to protect the interests of the class. *See* Fed. R. Civ. P. 23(a)(4). This

---

[8]Following oral argument, the Objectors sought to strengthen their arguments by filing a citation of supplemental authority pursuant to Fed. R. App. P. 28(j), drawing the court's attention to *Woodman v. KERA, LLC*, ___ N.W.2d ___, Nos. 275079/275882, 2008 WL 3355624 (Mich. Ct. App. Aug. 12, 2008). Review of *Woodman* does not alter our conclusion that this settlement has not been shown to be unfair.

requires that the class representatives exercise some oversight of the class counsel so as to avoid simply turning the conduct of the case over to the class counsel. *See Bovee v. Coopers & Lybrand*, 216 F.R.D. 596, 615 (S.D. Ohio 2003). Oversight from the class representatives is particularly important in the context of settlements. *See In re Cal. Micro Devices Sec. Litig.*, 168 F.R.D. at 262 (risk of unfair settlement is greater when negotiations are carried out "without meaningful oversight by class representative"). These principles suggest that class representatives should not be removed from their positions as class representatives simply because they have attempted to fulfill their duty to protect the interests of the class. Nevertheless, the law allows class representatives to be replaced when events occurring after class certification have rendered them inadequate, *see* 5 James Wm. Moore et al., Moore's Federal Practice § 23.25[6], and the law also recognizes that the development of a conflict of interest between the class representatives and the other class members may be sufficient to render the original class representatives inadequate. *See Heit v. Van Ochten*, 126 F. Supp. 2d 487, 495 (W.D. Mich. 2001); *cf. UAW*, 497 F.3d at 626 (absence of conflicts of interest is important consideration in determining adequacy of class representatives). In this case, the district court found that the original class representatives' objections to the settlement created a conflict of interest between them and the rest of the class, and the Objectors — whose argument focuses on the inadequacy of the new class representatives — have not shown that finding to be an abuse of discretion. Therefore, we uphold the district court's decision in this regard.

IV.

The district court also acted without abusing its discretion by refusing to award fees and costs to the Objectors' attorney. Fees and costs may be awarded to the counsel for objectors to a class action settlement if the work of the counsel produced a beneficial result for the class. *See* Fed. R. Civ. P. 23, Committee Notes to Subdivision (h); *In re Cardinal Health, Inc. Sec. Litig.*, 550 F. Supp. 2d 751, 753 (S.D. Ohio 2008) (citing *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1051 (9th Cir. 2002); *In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 273 F. Supp. 2d 563, 565 (D.N.J. 2003)). In this case, the district court found that the work of the Objectors' counsel did not produce such a result for the class. *Gardner*, 2007 WL 1695609, at *7. This finding was not an abuse of discretion because, with the settlement agreement still in place, it is not apparent that the district court's finding was wrong. The Objectors argue that their counsel conferred a benefit upon the class by causing the removal of the unfair opt-out provision from the settlement agreement. However, it is not clear that this conferred any benefit on the class. One may argue that this reduced the size of the class and thereby increased the amount of money recovered by each plaintiff, but there is no indication that those who had previously opted out would not have done so again. As a result, the district court did not abuse its discretion in concluding that the Objectors' counsel did not produce a beneficial result for the class.

V.

For the foregoing reasons, the district court is AFFIRMED.