**In re SUMITOMO COPPER LITIGATION.**

**No. 96 Civ. 4584(MP).**

United States District Court, S.D. New York.

Nov. 15, 1999.

Cadwalader, Wickersham & Taft, New York, NY, for Defendant Global Minerals and Metals Corp.

Loeb & Loeb, New York, NY, for Defendants R. David Campbell and Bipin Shah.

Rogers & Wells, New York, NY, for Defendants Merrill Lynch & Co., Merrill Lynch Commodity Financing Inc. and Merrill Lynch Pierce Fenner & Smith, Inc.

Katten Muchin & Zavis, Chicago, IL, for Defendant Morgan Stanley & Co., Inc.

Miller Faucher Cafferty and Wexler, Chicago, IL, Lowey Dannenberg Bemporad & Selinger, P.C., White Plains, NY, Kirby McInerney & Squire LLP, New York City, Scott M. Brenner, New York City, Futterman & Howard, Chicago, IL, Meredith Cohen Greenfogel & Skirnick, Philadelphia, PA, Much, Shelist, Freed, Denenberg, Ament, Bell & Rubenstein, Chicago, IL, Plotkin & Jacobs, Chicago, IL, David Schachman & Assoc., Chicago, IL, Schubert & Reed L.L.P., San Francisco, CA, Stamell & Schager, New York City, Wolf Haldenstein Adler Freeman & Herz LLP, New York City, other counsel.

## OPINION

MILTON POLLACK, Senior District Judge.

Plaintiffs' counsel have petitioned for an allowance of fees and reimbursement of their expenses incurred in this case in connection with four settlements considered and approved at a fairness hearing held on October 5, 1999. The fees and expenses requested herein by Counsel were set forth in the notice of said hearing and no objection thereto was made by any Class Member.

Petitioners have obtained for the Class a recovery of $134,600,000 through settlements, of which by agreement with the settling parties only $116,600,000 is fee compensable. (By reason of accrual of interest on the funds deposited on the

Lovell & Stewart, LLP, New York, NY, for Plaintiffs.

Paul, Weiss, Rifkind, Wharton & Garrison, New York, NY, for Defendants Sumitomo Corporation and Sumitomo Corporation of America.

settlements, they amount to in excess of $139,300,000.)

Petitioners' seek a fee of 27.5% of the $116,600,000 or $32,065,000, plus interest earned by the funds on deposit and reimbursement of their expenses incurred in connection with this litigation of $1,895,-802.73.

The recovery is the largest class action recovery in the 75 plus year history of the Commodity Exchange Act ("CEA"), 7 U.S.C. § 1 *et seq.* Petitioners undertook this complex and difficult litigation on a contingent fee basis. Success and payment for Petitioners' efforts were extremely uncertain from the beginning, in circumstances of high risks and almost overwhelming magnitude and complexity. The case involves claims of commodity price manipulation in violation of the CEA. Such claims have been notoriously difficult to prove, and this case was initially greeted with widespread skepticism in the financial community. There was no governmental assist to ease the task with which Petitioners was confronted.

Pursuant to Pre–Trial Orders entered in this case, the firm of Lovell & Stewart was named lead Counsel and an executive committee was created, naming the Lovell firm as Chairman and Lowey Dannenberg Bemporad & Selinger, and Miller Faucher Cafferty and Wexler were designated as its other members. Additional counsel serving the interests of plaintiffs and members of the class numbered ten firms of attorneys.

The details of the immense task undertaken and the complexity thereof have been carefully followed by the Court. A limited indication of significant highlights thereof will suffice for present purposes. The extensive services required on behalf of the Class involved the inspection, digestion, review, and translation of a staggering quantity of data which was entered into document and trading databases and involved in excess of eleven million pages of documents (millions of pages were in Japanese and located in London, Hong

Kong or Tokyo). All of the foregoing were then analyzed and sorted out to formulate the significant facts for the litigation. Additionally, Petitioners were required to inspect seven million pages of documents, again in Japanese, located in Asia. Dozens of extensive depositions were taken, private sworn interviews were conducted and other witness interviews and investigations were undertaken. Counsel necessarily consulted extensively with more than ten experts to winnow out the essentials for the lawsuit. The claims against the Settling Defendants were strongly resisted and were proceeded with over resistance in various forms right up to the very eve of trial.

Petitioners had to deal with the hired experts on literally hundreds of issues (and sub-issues) to marshal the facts and the issues into manageable form realistically suitable for a trial, including: an understanding of dealings in futures contracts and physical copper, copper merchants customs and standards, Comex trading, LME (London Metals Exchange) trading, accounting and internal control issues, banks and brokerage firm issues, financials and derivatives, the workings of the market in physical copper, isolation of essential Japanese documents; analyses of the injured business customers, the interpretation of commodity futures documents (many in the Japanese language) and mastery of numerous economic issues regarding price and theories of price artificiality.

As explained in the petition, the foregoing is but a skeleton indication of the vast scope of the services and problems confronted by Counsel over a period in excess of three years. Resistance was encountered from the defendants at every stage of the fact finding process and the essential legal steps needed to forge actionable and settleable issues.

The foregoing necessarily incurred the enormous outlays of expenses. The experts and consultants and more than seven interpreters had to be retained and paid.

The substantial work performed by five of these experts and consultants related to the development of document databases to capture the nuances of the commodity futures trades and the myriad liability and damages issues. Two of those experts alone have each been paid in excess of $200,000 and the experts together make up approximately 50% of the total expert expenses incurred.

As another indication of the immensity of the tasks confronted, approximately $324,000 was incurred in the copying costs of lead counsel's firm alone, and the other firms incurred significant additional copying costs. The magnitude of the document copying to corral the fundamental issues was unprecedented in lead Counsel's experience. Counsel report that in order to reasonably hold down the vast copying expenses, substantial document inspections were made in the Defendants' premises. Prosecuting the case and its myriad issues resulted in photocopying literally in excess of 1,000,000 pages of documents.

Postage expense, while a minor matter, together with newspaper advertisements and related expenses necessarily incurred involved in excess of $176,000. The remainder of the costs of lead counsel largely involved the essential and extensive foreign travel, domestic travel, document storage and legal research.

The unprecedented effort of Counsel exhibited in this case led to their successful settlement efforts and its vast results. Settlement posed a saga in and of itself and required enormous time, skill and persistence. Much of that phase of the case came within the direct knowledge and appreciation of the Court itself. Suffice it to say, the Plaintiffs' counsel did not have an easy path and their services in this regard are best measured in the enormous recoveries that were achieved under trying circumstances in the face of natural, virtually overwhelming, resistance. The negotiation of each settlement that was made was at arms length and exhibited skill and perseverance on the part of lead counsel and an evident attempt to gain for the Class the optimum settlement figures that could be reached.

Turning now to the recognized methods for establishing a suitable fee award in the circumstances of this case, two recognized methods exist for determining an appropriate award in a class action, namely, the "lodestar" method and the "percentage of the recovery" method.

No one expects a lawyer whose compensation is contingent on success of his services to charge, when successful, as little as he would charge a client who in advance has agreed to pay for his services, regardless of success. Nor, particularly in complicated cases producing large recoveries, is it just to make a fee depend solely on the reasonable amount of time expended. However, it is the Court's duty to avoid any sense of vicarious generosity or to permit the lodestar to be enhanced without restraint above a fair and reasonable amount under all the facts and circumstances, precluding any notion that there are no decent limits to compensation for services of an attorney serving another's interests.

It has long been recognized that a lawyer who recovers a "common fund" is entitled to a reasonable attorney's fee from the fund as a whole. *See Boeing Co. v. Van Gemert,* 444 U.S. 472, 478, 100 S.Ct. 745, 62 L.Ed.2d 676 (1980).

The United States Supreme Court consistently has held in decisions involving the computation of a common fund fee award that it is appropriate for a fee to be determined on a percentage-of-the-fund basis. *See Blum v. Stenson,* 465 U.S. 886, 900 n. 16, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984) ("under the 'common fund doctrine', ... a reasonable fee is based on a percentage of the fund bestowed on the class"); *see also Trustees v. Greenough,* 105 U.S. 527, 532–33, 15 Otto 527, 26 L.Ed. 1157 (1881); *Central R.R. & Banking Co. v. Pettus,* 113 U.S. 116, 124–25, 5 S.Ct. 387,

28 L.Ed. 915 (1885); *Sprague v. Ticonic Nat'l Bank*, 307 U.S. 161, 165–66, 59 S.Ct. 777, 83 L.Ed. 1184 (1939).

Courts increasingly have come to recognize the shortcomings of the lodestar/multiplier method as a universal rule for compensation. Support for the lodestar/multiplier approach in common fund cases has eroded, and there has been a "ground swell of support for *mandating* a percentage-of-the-fund approach" in the common fund cases. *See Florida v. Dunne*, 915 F.2d 542, 545 (9th Cir.1990) (emphasis added).

In *Gwozdzinnsky v. Sandler Assoc.*, 159 F.3d 1346 (2d Cir.1998), the Second Circuit affirmed an award of attorneys' fees equaling 25% of a common fund recovery. *Gwozdzinnsky* was a summary affirmance upholding a percentage fee award, citing *Blum v. Stenson*, 465 U.S. 886, 900 n. 16, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984).

After *Gwozdzinnsky*, this Court then employed the percentage fee method in *In re Prudential Sec. Inc. Ltd. Partnership Sec. Litig, ("Prudential")*, Order dated February 18, 1999. The first part of that fee order "awarded 27.5% of the settlement pools from each of the monetary settlements" as fees in a recovery of $110,000,000. *Id.*

The Second Circuit plainly stated in *Savoie v. Merchants Bank*, 166 F.3d 456, 460 (2d Cir.1999) that "the Supreme Court has implied that the percentage-of-the-fund method is a viable alternative" method of awarding fees in a common fund case. *Id. Savoie* was not a case in which a cash common fund was created for the benefit of a class by settlement of that action. In contrast, this case involves precisely (and nothing but) a cash fund.

At least eight other circuits— the First, Third, Sixth, Seventh, Ninth, Tenth, Eleventh and District of Columbia Circuits— have affirmatively approved the percent-age-of-recovery method as an appropriate method for determining attorneys' fees.

The petitioners herein suggest that 27.5% is an appropriate percentage award in the circumstances of this case. Petitioners call attention to the following facts among others in the evidentiary record as significant:

1. generally, price manipulation cases are notoriously risky and are more difficult and risky than securities fraud cases;

2. this case entailed substantial additional risks (relating to the size of the class, the duration of the manipulation, the absence of dominant positions, and extraterritorial aspects) which have been absent from all the previous, highly risky commodity manipulation cases.

■ Although the percentage-of-the-recovery formula is not necessarily optional for all cases, it has advantages and tends to align the interests of the attorneys with those of the class. One should recognize that it is uniquely the formula that mimics the compensation system actually used by individual clients to compensate their attorneys. The contingent fee is an incentive system that substitutes for more costly judicial or individual monitoring of the attorney's performance. Indeed, in the large class action, individual negotiations between the attorney and the class (and individual monitoring by the class member) is not feasible.[1]

In a similar vein, one Court has thus defined the role of the court in fee award determinations as serving as a proxy for the market and a decision on what a sophisticated fee-paying client would have agreed to pay (on a contingent basis) had such negotiations been possible. *See In re Continental Illinois Sec. Litig.*, 962 F.2d 566, 572 (7th Cir.1992). This is very different than deciding what is "fair" on an ex post basis.

---

1. See Supporting Opinion herein of Professor John C. Coffee, Jr. the Adolph A. Berle Professor of Law at Columbia University Law School.

Notwithstanding the recent apparent shift from the "lodestar" method in class cases, the evidentiary record herein adequately supports use of the lodestar (or percentage of the fund) method in the unique circumstances of this record.

In considering the fairness of the fees requested pursuant to a lodestar and multiplier approach, courts frequently look to the factors enunciated by the Second Circuit in *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 470 (2d Cir.1974). *See also In re Ames Department Stores, Inc.*, 835 F.Supp. 147, 150 (S.D.N.Y.1993) (Pollack, J.). ("The Court has broad discretion . . . to adjust the lodestar to take account of such factors as: (I) the contingent nature of the expected compensation for their services; (ii) the consequent risk of non-payment viewed as of the time of filing the suit; (iii) the quality of the representation; and (iv) the result achieved.")

Petitioners have submitted affidavits from lead counsel and from each of the other law firms in this case. In their affidavits, responsible attorneys attest, based upon personal knowledge, to (a) the number of attorney and paralegal hours which each firm worked on this litigation through July 9, 1999, and (b) the total lodestar value of such work at the current non-contingent hourly rates charged by the firm for such services

Based upon these Affidavits, Petitioners attest that they performed 48,314.25 hours of work, as yet uncompensated which is valued --- at the current ordinary non-contingent billing rates for the attorneys and other professionals who performed the work --- at $12,841,969.75.

The foregoing lodestar totals do not reflect the extensive service time remaining in this case to help class members with their Proofs of Claims; to prepare and present the requisite schedules to this Court and to distribute the proceeds of the settlement to class members, and to handle the necessary Internal Revenue Service reports where required and ultimately distribute the checks and to account to the Court for the completion of the purposes of the case, etc. However, Petitioners agree to perform all of these subsidiary services in consideration for the requested fee. Among the factors considered by *Grinnell* is whether plaintiffs' counsel had the benefit of a prior judgment or decree in a case brought by the government. Here, plaintiffs not only did not (and do not) have the collateral estoppel benefit of such a judgment or decree, but had no "roadmap" or other assistance whatsoever in vigorously developing and prosecuting the high risk claims herein.

The investigation and discovery undertaken by Plaintiffs' counsel assisted the government in the preparation by the Commodity Futures Trading Commission ("CFTC") of its proceedings which, respectively, were filed two years and three years after Plaintiffs had commenced this action. *Id.* For example, Plaintiff's inspection of the more than 11,000,000 pages of documents previously mentioned occurred before any action by the CFTC. *Id.* Moreover, the CFTC, as a foreign sovereign, did not have access to 6,000,000 pages of these documents and subpoenaed the Petitioners therefor. Thereafter, the CFTC filed its litigation complaint in May, 1999.

Further, the CFTC proceedings actually undercut Plaintiffs' claims by greatly shortening the time of alleged manipulation. Because they did not provide any new facts or "roadmap" and began, respectively, two and three years after this action, the very limited government proceedings did not help Petitioners in any way to overcome the complexities and risks of this action.

The factual complexities included the existence and analysis of the relationships between and among more than thirty Comex futures contracts, more than 500 LME contracts, literally hundreds of physical contracts, and millions of tons involved in the copper futures, the copper options and the copper derivative contracts.

The legal complexities begin with the complex allegations under the Commodity Exchange Act, 7 U.S.C. § 1 *et seq.* and the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 *et seq.* These allegations, as well as Defendants' complex defenses, lead to substantial complexity in the proof of the primary elements of a claim for manipulation: (a) the existence of an artificial price; (b) proof of a manipulative intent to cause that artificial price; and (c) proof of the ability to cause that artificial price.

A key issue in the case (the existence of an artificial price) is the result of interdependent and unseen forces that exist in the explanations and theories of economists, traders and others. That cannot be observed as a tangible fact. Plaintiffs had the burden to prove the existence of this artificial price in more than 30 Comex copper futures contracts based upon the effects of overseas and domestic conduct which must be traced as a cause of such alleged artificial price. This factor alone strongly supports a substantial multiplier of the Petitioners' lodestar.

The risks to counsel in this action were extremely high and included substantial additional risks which have not been present in any commodity futures manipulation case insofar as this Court is aware.

Not only did Petitioners take those risks, but they advanced their own funds (in excess of $1.8 million) and financed the actions for over three years. Because of the magnitude of the action, the 11,000,000 pages of documents inspected, the trading data-base systems which had to be put in place, and the complexity of the factual and legal issues faced, Petitioners were required to expend substantial amounts of professional time and money away from other professional business in order to prosecute the action, with no certainty of recovery thereof from any source. Thereby, the already high risks of this litigation were greatly multiplied.

Petitioners are entitled to reimbursement of the expenses which they have incurred. The Court has carefully reviewed the affidavits and affirmations from responsible attorneys within each Petitioner counsel law firm setting forth the amounts of the expenses incurred.

Based upon this Court's prior decisions, overtime secretarial charges and computers and software purchased for use in connection with the trading data bases have not been charged as expenses.

■ A multiplier of the lodestar of 2.5 times the reported charges would be reasonable in the circumstances of this case undertaken by counsel and the record breaking result achieved. Lawyers are entitled to be paid more than their normal hourly charges when outstandingly successful in a case such as this.

In adjusting the lodestar, the Second Circuit and courts in this district also have taken into account the social and economic value of class actions, and the need to encourage experienced and able counsel to undertake such litigation. *See, e.g., Alpine Pharmacy v. Chas., Pfizer & Co. Inc.,* 481 F.2d 1045, 1050 (2d Cir.1973); *In re Warner Communications Sec. Litig.,* 618 F.Supp. at 735, 750–51 (S.D.N.Y.1985).

"In recent years multipliers of between 3 and 4.5 have been common" in federal securities cases. *Rabin v. Concord Assets Group, Inc.,* 1991 WL 275757, at *2 (S.D.N.Y.) (4.4 multiplier), quoting *O'Brien v. National Property Analysts,* 88 Civ. 4153, Tr. at P. 72 (S.D.N.Y. July 27, 1989); *accord In re Nasdaq Market–Makers Antitrust Litig.,* 187 F.R.D. 465, 489 (S.D.N.Y.1998).

Reference may be made also to the record-breaking employment discrimination settlement with Texaco. In that situation, a multiplier was utilized of 5.5 times lodestar. *See Roberts v. Texaco, Inc.,* 979 F.Supp. 185, 198 (S.D.N.Y.1997); *see also, In re Beverly Hills Fire Litig.,* 639 F.Supp. 915, 924 (E.D.Ky.1986) (5 times multiplier); *In re RJR Nabisco, Inc. Sec. Litig.,* [1992 Transfer Binder] Fed. Sec.

L.Rep. (CCH) ¶ 96,984 (S.D.N.Y.1992) (Mukasey, J.) (awarding a percentage-based fee representing 6 times lodestar).

In this case, a multiplier of 2.5 times of the lodestar calculation would yield a result that coincides with the percentage award sought by the petitioners. In this case it plainly appears from the evidence that there is little need to depart from the lodestar method in order to arrive at a fair and reasonable compensation to Counsel. Criticisms have been raised in connection with the notorious settlement of tobacco litigation in which disputes have highlighted contingency fees for attorneys representing the states.

Because both the lodestar and the percentage method of determining the amount of a fee amply support Petitioners' requested fee herein, the blanket criticisms of attorneys' fees in the tobacco cases are wholly inapplicable to the facts and circumstances in this case.[2]

### Conclusion

The fees of petitioners payable out of the Class recovery are fixed and allowed at $32,065,000 representing 27.5% of the recovery compensable for fee purposes. Counsels' costs and expenses of $1,895,-802.73 shall be reimbursed currently out of the funds representing the Class recovery. An advance shall be made to Counsel against said payable fees out of the Funds on deposit within 30 days hereof in the amount of 75% of the fee award. An amount representing 25% of said fee award shall be reserved for payment to be made contemporaneously with distribution of the Class Fund to the Class Members and the termination of the Class Fund. It is fair and equitable that the interest earned on the deposited fund should be payable to the Class as compensation to it and as some reimbursement for uncompensated losses of the Class Members. The amount of the percentage fee awarded and the enhancement of the lodestar for comparison to the percentage fee awarded have included consideration for the necessary further services and delay in completely satisfying the lodestar and contingency interests until they have ripened into an actual distribution to the Class.

The fees awarded to Counsel are in satisfaction of all services previously rendered as well as those administrative services contemplated and required to be performed in connection with the distribution of the Fund from the partial settlements. In the event that unusual or extraordinary services are required, the attorneys for the Class may apply to the Court for further consideration of such circumstances.

Lead Counsel shall submit an appropriate form of Order accordingly which shall also direct that, for administrative convenience and in pursuance of the agreement of all of Plaintiffs' participating Counsel, the firm of Lovell and Stewart, LLP Esqs. is authorized and directed to allocate the fees and disbursements awarded by this Order among all participating Counsel on behalf of Plaintiffs in accordance with their respective Stipulations. The Court has reviewed the allocations and is satisfied that they represent fairly the participation of Counsel involved.

The Court retains jurisdiction of this matter for interpretation and implementation of the terms and purposes hereof. So Ordered.

---

**2.** The criticisms of the retainer agreements entered into by the state attorneys general which later resulted in claimed billions of dollars of attorneys' fees in the tobacco cases are reminiscent of earlier agreements and shareholder by-laws creating millions of dollars of bonus compensation for tobacco company executives during the height of the Great Depression. For consideration of the latter, see *Rogers v. Hill*, 289 U.S. 582, 53 S.Ct. 731, 77 L.Ed. 1385 (1933); see dis. opn. 60 F(2) 109, *113 (2d Cir.1932); and *Heller v. Boylan*, 29 N.Y.S.2d 653 (N.Y.Sup.Ct.1941).