In re INFOSPACE, INC. SECURITIES LITIGATION.

This Document Relates to: All Actions

No. C01–931Z.

United States District Court,
W.D. Washington,
at Seattle.

Aug. 5, 2004.

1204

Steve W. Berman, Hagens Berman, Karl Phillip Barth, Lovell, Stewart, Halebian & Barth, Seattle, WA, Murray T.S. Lewis, Steven J. Toll, Cohen, Milstein, Hausfeld & Toll, Washington, DC, Charles J. Piven, Baltimore, MD, Tamara J. Driscoll, Lerach, Coughlin, Stoia & Robbins, Juli Farris Desper, Keller Rohrback, Matthew James Ide, Dan Drachler, Zwerling, Schachter & Zwerling, Seattle, WA, for plaintiffs.

Carl J. Marquardt, Kelly Twiss Noonan, Stokes Lawrence, Arthur W. Harrigan, Jr., G. Val Tollefson, Randall Thor Thomsen, Danielson Harrigan & Tollefson, William H. Beaver, Jr., Karr Tuttle Campbell, Curt Roy Hineline, Dorsey & Whitney, Gwynne L. Skinner, The Public Interest Law Group PLLC, Seattle, WA, for defendants.

## ORDER

ZILLY, District Judge.

This matter comes before the Court on Plaintiffs' counsel's motion for attorneys' fees and reimbursement of expenses, docket no. 120. Plaintiffs' counsel seek attorneys' fees equal to 25 percent of the settlement fund, specifically $8,456,353.94, plus interest, together with reimbursement of expenses in the amount of $462,984.23, and payments to lead Plaintiffs Ronald Wyles of $6,600 and Amir Heshmatpour of $5,000.

Plaintiffs' counsel in this case consists of the law firms of Millberg Weiss Bershad Hynes & Lerach LLP, Hagens Berman LLP, and Schiffrin & Barroway, LLP. As reflected in the pleadings filed in support of the motion for attorneys' fees, a total of 29 attorneys incurred 4,172.9 hours, having a claimed value of $1,252,364.75, in connection with this case. Objections to the amount of attorneys' fees to be awarded have been filed by The New York State Teachers' Retirement System, the Public Employee Retirement System of Idaho, and the Maryland State Retirement and Pension System.

The matter first came before the Court on May 7, 2004. As a result of objections having been filed, the Court requested further briefing and set a hearing date of June 25, 2004. Briefing was submitted by Plaintiffs' counsel and by the New York State Teachers' Retirement System. The Court held oral argument on June 25, 2004. At this hearing, Wayne Schneider, General Counsel for The New York State Teachers Retirement System, appeared specially to oppose the amount of attorneys' fees being requested. The Court then took the matter under advisement. The Court now being fully advised enters the following Order.

### BACKGROUND

This class action was filed on June 19, 2001. Compl., docket no. 1; *see* Egler Decl., docket no. 128, ¶ 3. The matter was brought as a securities fraud class action against InfoSpace, Inc. for allegedly making false statements regarding InfoSpace's performance and the future of InfoSpace, causing the price of InfoSpace securities to trade at artificially inflated prices. Egler Decl., docket no. 128, ¶ 5. On January 22, 2002, Plaintiffs filed a Consolidated Complaint, which added information obtained from their ongoing investigation. Cons. Compl., docket no. 38; Egler Decl., docket no. 128, ¶ 14. Plaintiffs continued their investigation in anticipation of filing a Consolidated Amended Complaint, which was filed on May 9, 2002. Egler Decl., docket no. 128, ¶¶ 14–15. Prior to the filing of the Consolidated Amended Complaint, Defendants had filed a motion to dismiss on April 8, 2002, which was later stricken. Mot., docket no. 41; Stip., docket no. 54. On July 2, 2002, Defendants filed a second motion to dismiss, but the case was stayed on August 12, 2002. Mot., docket no. 60; Order, docket no. 85; Egler Decl., docket no. 128, ¶ 15. Ultimately, the case was settled without any response by Plaintiffs to the renewed motion to dismiss.

### Factual Investigation and Discovery

Plaintiffs' counsel investigated and analyzed the claims asserted by the class and the defenses raised by Defendants in their motion to dismiss by "reviewing InfoSpace's public filings, annual reports, analyst reports, press releases, and other public statements, and also reviewing information available through the New York Attorney General's Office." Egler Decl., docket no. 128, ¶ 19. Plaintiffs' counsel also reviewed 11 boxes of documents produced in discovery. *Id.*, ¶ 25. More than a dozen former InfoSpace employees were interviewed. *Id.*, ¶ 21. Affiliate partners, other companies similar to InfoSpace, and former customers of InfoSpace were also contacted and interviewed. *Id.*, ¶¶ 21–22. A statistical analysis of stock sales and

encumbrances were performed, and counsel monitored various other litigations brought against, or initiated by, InfoSpace. *Id.*, ¶¶ 23–24.

## The Settlement

Settlement negotiations began on September 5, 2003, and continued periodically for six months. Egler Decl., docket no. 128, ¶ 27. The parties signed a settlement agreement on February 13, 2004. *Id.* ¶ 29. On May 7, 2004, the Court approved the settlement of this case resulting in a cash settlement fund of $34,300,000. Order, docket no. 138; Egler Decl., docket no. 128, ¶ 30. Plaintiffs' counsel seek a fee of 25 percent of the settlement fund after reimbursement of out-of-pocket expenses of $474,584.23. Plaintiffs' counsel request a total award of $8,456,353.94.

## Discussion

■■■ Under the common fund doctrine, attorneys may recover fees from the damage award obtained. *Six Mexican Workers v. Ariz. Citrus Growers*, 904 F.2d 1301, 1311 (9th Cir.1990). An award of attorneys' fees for creating a common fund may be calculated in one of two ways: (1) a percentage of the funds created; or (2) "the lodestar method, which calculates the fee award by multiplying the number of hours reasonably spent by a reasonable hourly rate and then enhancing that figure, if necessary, to account for the risks associated with the representation." *Paul, Johnson, Alston & Hunt v. Graulty*, 886 F.2d 268, 272 (9th Cir.1989) (citations and internal quotes omitted). The Ninth Circuit has approved either method for determining a reasonable award of fees. *Id.* The fee award must be reasonable under the circumstances. *In re Washington Pub. Power Supply Sys. Sec. Litig.*, 19 F.3d 1291, 1296 (9th Cir.1994) ("WPPSS"). *See also* Private Securities Litigation Re-

form Act of 1995 ("PSLRA"), 15 U.S.C. § 78u–4(a)(6) ("Total attorneys' fees and expenses awarded by the court to counsel for the plaintiff class shall not exceed a reasonable percentage of the amount of any damages and prejudgment interest actually paid to the class."). When awarding attorneys' fees from a settlement fund, "the district court must assume the role of fiduciary for the class plaintiffs." *WPPSS*, 19 F.3d at 1302.

### A. Percentage of Settlement Fund

The Ninth Circuit has established 25 percent of a settlement fund as a "benchmark" award for attorneys' fees in common fund cases. *Torrisi v. Tucson Elec. Power Co.*, 8 F.3d 1370, 1376 (9th Cir.1993) (citing *Six Mexican Workers*, 904 F.2d at 1311; *Graulty*, 886 F.2d at 272 (noting that fee awards range from 20 to 30 percent of the fund)). In circumstances where a percentage recovery would be too small or too large in light of the hours worked or other relevant factors, the "benchmark percentage should be adjusted, or replaced by a lodestar calculation." *Torrisi*, 8 F.3d at 1376 (citations omitted). "Selection of the benchmark or any other rate must be supported by findings that take into account all of the circumstances of the case." [1] *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1048 (9th Cir.2002). *See also WPPSS*, 19 F.3d at 1298 ("courts cannot rationally apply any particular percentage—whether 13.6 percent, 25 percent or any other number—in the abstract, without reference to all the circumstances of the case").

For example, in *Six Mexican Workers*, the class members were awarded $1,846,500 after completion of the trial. 904 F.2d at 1304. Counsel were awarded attorneys' fees in the amount of 25 percent

---

1. "The question is not whether the district court should have applied some other percentage, but whether in arriving at its per-

centage it considered all the circumstances of the case and reached a reasonable percentage." *Vizcaino*, 290 F.3d at 1048.

of the damages under the common fund doctrine. *Six Mexican Workers*, 904 F.2d at 1304. On appeal, the Ninth Circuit found that the circumstances of the case did not warrant a reduction from the 25 percent benchmark and that the award was well within the range of recoveries of this size. *Id.* The litigation had lasted more than 13 years, obtained substantial success, and involved complex legal and factual issues. *Id.* The opinion does not state whether any class members objected to the amount of fees requested.

In *Vizcaino*, the case settled after two years of negotiations, resulting in a settlement fund of $96,885,000. 290 F.3d at 1046. After making extensive findings of fact and conclusions of law, the district court awarded attorneys' fees in the amount of $27,127,800 (28 percent of the cash settlement fund).[2] *Vizcaino*, 290 F.3d at 1046. Only two class members objected to the amount of requested fees. *Id.* Representation had extended over an eleven-year period, entailed hundreds of thousands of dollars of expense, and required counsel to forego other work, resulting in a decline in the firm's annual income. *Id.* at 1050 (citing *Six Mexican Workers*, 904 F.2d at 1311; *Torrisi*, 8 F.3d at 1377 (considering counsel's bearing the financial burden of the case); *Bebchick v. Wash. Metro. Area Transit Comm'n*, 805 F.2d 396, 407 (D.C.Cir.1986)).

Plaintiffs' counsel contend that an examination of the circumstances of the case warrants a 25 percent award. The New York State Teachers' Retirement System ("NYST") argues that a 25 percent fee is not the norm in cases for awards in federal securities class actions and that a lodestar cross-check warrants a substantial downward adjustment.

### 1. Exceptional Results

■■■■ "Exceptional results are a relevant circumstance" to consider when determining a reasonable fee. *Vizcaino*, 290 F.3d at 1048. In *Vizcaino*, plaintiffs' counsel pursued the case in the absence of supporting precedence. *Id.* But see *WPPSS*, 19 F.3d at 1303 (large size of settlement fund, in relation to awards in other cases, "does not, *ipso facto*, mean that it is an extraordinary result"). In this case, a $34.4 million settlement fund has been created as a result of the efforts of Plaintiffs' counsel. The preliminary damage analysis for the total class was $1 billion, assuming that all of the loss in the stock price was attributable to Defendants' actions. Egler Decl., docket no. 128, ¶ 40. Plaintiffs' counsel contend that the strength of plaintiffs' case drove the settlement and that the settlement represents a substantial recovery in light of the internet market crash and the stock drops in InfoSpace's peer group during the class period; proving causation would have been difficult.[3] Plaintiffs' counsel also contend that the settlement represents a substantial recovery due to the uncertainties of surviving a motion to dismiss.[4] The Court finds

---

2. In *Vizcaino*, the court considered whether counsel were able to achieve exceptional results, whether the case was risky for counsel, and whether counsel's performance generated benefits beyond the cash settlement fund. 290 F.3d at 1048–49. The Court also considered the amount of time spent on the case, the costs generated, and the loss of significant other work. *Vizcaino*, 290 F.3d at 1050.

3. Notably, InfoSpace's proxy peer group dropped around 56 percent during the class period, compared to the 91 percent drop in price of InfoSpace stock during the class period. Egler Decl., docket no. 128, ¶ 40.

4. The notice sent to plaintiffs regarding the proposed settlement explains that "the proposed settlement is a good recovery and is in the best interest of the Settlement Class." Letter, docket no. 105, Ex. B (Notice, pg. 1). The notice also explains that due to the risks associated with litigation, there was a danger that plaintiffs would have recovered nothing if

that Plaintiffs' counsel obtained a substantial recovery, but not an exceptional recovery.

### 2. Risks of Litigation

■ Risk is another relevant circumstance. *Vizcaino*, 290 F.3d at 1048. In *Vizcaino*, the case was extremely risky for class counsel because plaintiffs lost twice in the district court and succeeded twice on appeal. 290 F.3d at 1048. Additionally, the case was pursued in the absence of supporting precedence, in the face of agreements signed by class members forfeiting benefits, and Microsoft's opposition. *Id.*

In this case, Plaintiffs' counsel contend that the risk of no recovery in securities fraud cases is significant and that many cases end in dismissal of the complaint. Counsel state that even after "extensive investigations and interviews, serious questions remained in [their] minds about [their] ability to meet the current Ninth Circuit's standard regarding proof of a strong inference of scienter." Egler Decl., docket no. 128, ¶ 35. Counsel further state that "many of the statements upon which plaintiffs' fraud allegations were based were arguably 'forward-looking statements' protected by the Safe Harbor provisions of the PSLRA." Pl. Reply, docket no. 145, pg. 2.

However, most securities fraud cases settle. *Goldberger v. Integrated Res., Inc.,* 209 F.3d 43, 52 (2d Cir.2000); *In re Critical Path, Inc. Sec., Litig.,* No. 01–03756, 2002 WL 32627559, at *9–10, 2002 U.S. Dist. LEXIS 26399, at *31–32 (N.D. Cal.

June 18, 2002); McCue Decl., docket no. 147, ¶ 5. And the dismissal rate in the Ninth Circuit has been reported as being only 6 percent. Bull Decl., docket no. 121, Ex. 1 (Elaine Buckberg et al., Recent Trends in Securities Class Action Litigation: 2003 Early Update (Feb.2004)). Even if the claims have little merit, "the damage potential is so frightening and the costs of discovery so large" that corporations settle. Jonathan J. Lerner, *Shifts Seen on Fees in Securities Cases,* N.Y.L.J., Dec. 3, 2001, at L4. Additionally, there is a strong incentive for companies to settle because "insurance or indemnification arrangements are available to fund a settlement but not to pay a fraud judgment." Gilbert C. Miller, *The PSLRA: Rebalancing Litigation Risks and Rewards for Class Action Plaintiffs, Defendants and Lawyers,* 51 Bus. Law. 1009, 1037–38 (1996).

■ This was not a complex matter, and the risks associated with this litigation were no greater than the risks presented in any other securities action. There was only a modest risk to recovery. Notably, the actual recovery here is risk-free; the entire settlement fund was paid by InfoSpace's insurers.[5]

### 3. Fees Awarded in Similar Class Actions

■ Courts may refer to awards made in other settlements of comparable size when determining whether an award is reasonable. *See Vizcaino*, 290 F.3d at 1050 n. 4. *Cf. WPPSS* 19 F.3d at 1297 (25 percent benchmark not applied where set-

---

the case had not settled and proceeded to trial. *Id.*

5. It is appropriate to consider counsel's reasonable expectations, which are "based on the circumstances of the case and the range of fee awards out of common funds of comparable size." *Vizcaino,* 290 F.3d at 1050.

Plaintiffs' counsel argue that this factor supports their request for a 25 percent fee. While it is true that contingent fees may far exceed the market value of service rendered on a non-contingent basis, this principle reflects the purpose for enhancing the lodestar to reflect the risk of nonpayment. *See WPPSS,* 19 F.3d at 1299–1300.

tlement fund far exceeded the amount of settlement funds in virtually all similar cases). Plaintiffs' counsel cite to several cases in which a fee of 25 percent or more was awarded. Pl. Mot., docket no. 120, pg. 9. However, in all of the cases cited in counsel's brief, the courts considered the circumstances of the case to determine whether the fee award was reasonable. *See In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454 (9th Cir.2000); *In re Rite Aid Corp. Sec. Litig.*, 146 F.Supp.2d 706, 735–36 (E.D.Pa.2001) ("*Rite Aid I*"); *In re Sunbeam Sec. Litig.*, 176 F.Supp.2d 1323, 1334 (S.D.Fla.2001); *In re Sumitomo Copper Litig.*, 74 F.Supp.2d 393 (S.D.N.Y. 1999); *In re Lease Oil Antitrust Litig.*, 186 F.R.D. 403 (S.D.Tex.1999).[6]

For example, in *Rite Aid I*, the court applied the percentage method to calculate the appropriate amount of fees that should be awarded from a $193 million settlement fund. *Rite Aid*, 146 F.Supp.2d at 734. The court found a 25 percent fee award to be reasonable after considering all of the circumstances of the case, such as the skill and efficiency of the attorneys, the complexity and duration of the litigation, the number of class members who would benefit, and the fact that no class member had objected to the amount of requested fees. *Id.* at 735–36. The court also considered awards granted in other "mega settlements" and noted that "settlements of $52 million and over ranged in fee percentages from 18% to as high as 37%" and that "the average percentage of settlements be-

tween $100 million and $200 million is 28.1%." *Id.*

However, in a subsequent proceeding, the sequel to the partial settlement, the court noted that "there should not be any automatic presumption that a 25 percent fee is appropriate." *In re Rite Aid Corp. Sec. Litig.*, 269 F.Supp.2d 603, 610 (E.D.Pa.2003) ("*Rite Aid II*"). In *Rite Aid II*, the court performed a lodestar cross-check and approved a 25 percent fee award. *Id.* at 611.

The NYST has also cited to several cases in which a fee of less than 25 percent was reasonable. These cases involve circumstances where the attorneys requested a lower amount.[7] *See Teachers' Ret. Sys. v. A.C.L.N., Ltd.*, No. 01–CV–11814(MP), 2004 WL 1087261, at *5–6, 2004 U.S. Dist. LEXIS 8608, at *16–17 (S.D.N.Y. May 14, 2004); *In re Cylink Sec. Litig.*, 274 F.Supp.2d 1109, 1115–16 (N.D.Cal.2003); *Critical Path*, 2002 WL 32627559, at *8, 2002 U.S. Dist. LEXIS 26399, at *25; *Enterasys Networks, Inc. Sec. Litig., Sprint Corp. Sec. Litig., Homestore.com, Inc. Sec. Litig.*, NYST Resp., docket no. 105, Exs. C, D, & E.

**4. 25% Fee Award is Not Reasonable**

 The Court is troubled by the establishment of a 25 percent benchmark as the starting basis for an award of attorneys' fees in common fund cases. When enacting the PSLRA, Congress praised securities actions as a means by which "de-

---

6. The Court notes that in many of these cases few, if any, class members objected to the requested fee award. *See Mego Financial*, 213 F.3d at 457 (only a handful of class members objected to the settlement); *Rite Aid*, 146 F.Supp.2d at 735 ("*Rite Aid I*") (no class members objected); *Sunbeam*, 176 F.Supp.2d at 1337 (one of four institutional investors objected); *Sumitomo*, 74 F.Supp.2d at 394 (no class members objected); *Lease Oil*, 186 F.R.D. at 409, 416 (some class members objected to the settlement).

7. Counsel further contend that the skill required and the quality of work, the difficulty of the question presented, and the reaction of the class support a 25 percent fee award. The Court finds that the consideration of counsel's skills and the difficulty of the case does not warrant application of the 25 percent benchmark. Additionally, even though only a few class members have objected, the Court must still act as a fiduciary and protect the interests of the class members when awarding fees.

frauded investors [could] recover their losses without having to rely upon government action." H.R. Conf. Rep. No. 104–369, at 32 (1995), *reprinted in* 1995 U.S.C.C.A.N. 730, 730–31. One of Congress' objectives in passing the PSLRA was to prevent lawyer-driven lawsuits "by giving control of the litigation to lead plaintiffs with substantial holdings of the securities of the issuer." *Id.* However, awarding large fee awards to plaintiffs' counsel from the settlement fund does not promote the objectives of the PSLRA.

Awarding attorneys' fees from the common fund is premised "on the perception that persons who obtain the benefit of a lawsuit without contributing to its cost are unjustly enriched at the successful litigant's expense." *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478, 100 S.Ct. 745, 62 L.Ed.2d 676 (1980). In 1989, the Ninth Circuit cited with approval *Mashburn v. Nat'l Healthcare, Inc.*, 684 F.Supp. 679, 692 (M.D.Ala.1988), when it held that a 25 percent benchmark fee is proper in common fund cases.[8] *Graulty*, 886 F.2d at 272–73 (9th Cir.1989).

There is nothing inherently reasonable about a 25 percent recovery, and the courts applying this method have failed to explain the basis for the idea that a benchmark fee of 25 percent is logical or reasonable. *See* Lisa L. Casey, *Reforming Securities Class Actions from the Bench: Judging Fiduciaries and Fiduciary Judging*, 2003 BYU L.Rev. 1239, 1279 (2003) ("review of numerous reported decisions fails to reveal the basis for the notion that the benchmark fee is reasonable"). *See also In re Washington Pub. Power Supply Sys. Sec. Litig.*, 779 F.Supp. 1056, 1060 (D.Ariz.1991) ("The 'benchmark' of 25% suggested in *Graulty* . . . is arbitrary and artificial"); *In re Superior Beverage/Glass Container Consol. Pretrial*, 133 F.R.D.

119, 125 (N.D.Ill.1990) (a " 'percentage' is a relational concept. Percentage of *what?* Fifty percent is neither a lot nor a little, until one knows what the underlying whole is. Half of one cookie isn't much. Half of a full cookie jar may well be a lot").

Some courts have considered 20–30 percent fee awards as being consistent with contingent fees generally negotiated by attorneys in private litigation. For example, in *In re Continental Illinois Sec. Litig.*, 962 F.2d 566, 572 (7th Cir.1992), the court stated that "class counsel are entitled to the fee they would have received had they handled a similar suit on a contingent fee basis, with a similar outcome, for a paying client." In personal injury suits, attorneys and clients typically agree upon a contingent fee of 33 to 50 percent of the recovered amount. *Id.* The fee awarded is proportional to the amount recovered by the plaintiff, and the plaintiff, ideally, recovers more than the attorney. In class actions, particularly those involving securities fraud, the fee award is not proportional to the amount recovered by the individual class member.

Awarding fees as a percentage of the common fund or settlement fund provides an incentive to attorneys to obtain large victories. However, these "victories" are sometimes obtained with minimal effort, and the large award obtained "is often due more to the number of class members or the defendant's past acts than to the attorney's actual skill." Monique Lapointe, *Attorney's Fees in Common Fund Actions*, 59 Fordham L.Rev. 843, 869 (1991). The compensation actually paid to class members represents only a fraction of their actual losses.

Securities class actions tend to settle for relatively small amounts in comparison to

---

**8.** The court in *Mashburn* found that the majority of common fund fee awards were between 20 to 30 percent of the fund. 684 F.Supp. at 692.

the loss suffered. In 2003, the median percentage recovery of investor losses was 2.8 percent.[9] Bull Decl., docket no. 121, Ex. 1 (Elaine Buckberg et al., Recent Trends in Securities Class Action Litigation: 2003 Early Update (Feb.2004)). The median investor loss of those settling cases in 2003 was $215 million. *Id.* Studies show that settlements in securities cases are not keeping up with the rising investor losses. *Id.* Retirement funds have been erased. And, as class members struggle to figure out how, or if, they will ever be able to retire, attorneys collect millions, and the class members, upon whose behalf the case was brought, recover a pittance.

The estimated average recovery for the class members in this case is 19 cents per share before fees and expenses are deducted. Schneider Letter, docket no. 105, Ex. B (Notice of Settlement). If the Court were to award plaintiffs' counsel's requested fee, the average recovery would be reduced to approximately 14 cents per share. *Id.* During the class period, the stock price dropped from a high of $138 1/2 to $5 7/16, which is an overall loss of approximately $133 per share. *Id.* Amended Consol. Cmplt., docket no. 51, ¶¶ 1, 11, 190. A 14 cent recovery amounts to a 0.10 percent recovery per share based on the value of the share.

Unlike a plaintiff in private litigation, class members generally have little control over their choice of counsel and the fee is not always negotiated in advance. Moreover, once a settlement amount is agreed upon, the defendants have little interest in how the money is distributed and have no incentive to oppose the fee. Institutional investors rarely get involved. And class members rarely object to the requested amount of fees. There is no incentive to challenge a request for fees "that would result in only a 'minuscule' pro rata gain from a fee reduction." *Goldberger,* 209 F.3d at 53. However, when large investors become actively involved and are named lead plaintiffs, the settlement amounts are substantially larger and the attorneys' fees are lower. Schneider Letter, docket no. 134, Ex. A (Securities Fraud Monitor (Spring 2004)).

One of the major objectives of the PSLRA was to prevent lawyer litigation and "to ensure that institutional plaintiffs with expertise in the securities market and real financial interests in the integrity of the market would control the litigation, not lawyers." *In re Donnkenny Inc. Sec. Litig.,* 171 F.R.D. 156, 157 (S.D.N.Y.1997) (citing H.R. Conf. Rep. No. 104–369, at 31–35 (1995), *reprinted in* 1995 U.S.C.C.A.N. 730, 730–34). Institutional investors "look for ways to ensure that attorney fees are reasonable" and negotiate for significantly lower fees.[10] Schneider Letter, docket no. 133, Ex. A (Securities Fraud Monitor (Spring 2004)). More institutional investors need to become involved and play an active role to improve the recovery for class members in securities fraud litigation.[11]

 A 25 percent benchmark does not promote the objectives of the PSLRA. In

---

9. Some studies indicate that class members receive, on average, 5.1 percent of their damages. Lisa L. Casey, *Reforming Securities Class Actions from the Bench: Judging Fiduciaries and Fiduciary Judging,* 2003 BYU L.Rev. 1239, 1254 (2003). Other researches report a recovery of 3 to 7 percent. *Id.*

10. Fee agreements created with the input of investor institutions "often include anti-wind-fall provisions and other incentives that tie the lawyers' share to the size of the recovery and the length of the proceedings." Schneider Letter, docket no. 133, Ex. A (Securities Fraud Monitor (Spring 2004)).

11. In this case, only 3 of the 300 institutional plaintiffs objected to counsel's request for fees.

contrast to the 14 cents per share (or 0.10 percent recovery) to the class member investors, the 25 percent fee requested by plaintiffs' counsel, $8,456,353, results in an almost seven-fold increase for plaintiffs' counsel based on the number of hours spent on this case and the very high billable hourly rates reported by the attorneys. Such a result is unfair and does not provide a sound basis for an award of attorneys' fees in this case. Such an award would also constitute a substantial windfall to the attorneys to the detriment of the class members who would only recover pennies on the dollar.[12] The Court concludes that the lodestar method provides a more accurate basis for fees to be awarded in this case.[13]

### B. Lodestar Method

The lodestar is a measurement of an attorney's investment of time in the litigation and provides a perspective on the reasonableness of the percentage award. *Vizcaino*, 290 F.3d at 1050. If the investment of time is minimal, the Court may conclude that a lower percentage is reasonable. *Id.* The lodestar is calculated by multiplying the reasonable hours expended by a reasonable hourly rate. *Vizcaino v. Microsoft Corp.*, 142 F.Supp.2d 1299, 1302 (W.D.Wash.2001). Courts may enhance the lodestar with a multiplier to arrive at a reasonable fee. *Id.* When applying the lodestar method in common fund cases, a multiplier ranging from one to four is typi-

cally applied.[14] *See Vizcaino*, 290 F.3d at 1043 n. 6.

In *Vizcaino*, the district court determined that counsel had faced many obstacles and took a major risk by taking the case on a contingency fee basis and was, therefore, entitled to a multiplier for risk. 142 F.Supp.2d at 1305–6. Counsel in that case had argued "that in light [of] the extraordinary risk, difficulty, complexity, and exceptional results of the case, a multiplier of at least six and up to twenty or higher would be appropriate." *Id.* at 1306. The district court concluded that a multiplier of at least 3 or 4 was justified "in light of the complexity of [the] case, the risks involved, [ ] the length of the litigation," and the following factors:

(1) the time and labor required, (2) the novelty and difficulty of the questions involved, (3) the skill requisite to perform the legal service properly, (4) the preclusion of other employment by the attorney due to acceptance of the case, (5) the customary fee, (6) whether the fee is fixed or contingent, (7) time limitations imposed by the client or the circumstances, (8) the amount involved and the results obtained, (9) the experience, reputation, and ability of the attorneys, (10) the "undesirability" of the case, (11) the nature and length of the professional relationship with the client, and (12) awards in similar cases.

*Id.* (citing *Kerr v. Screen Extras Guild, Inc.*, 526 F.2d 67, 70 (9th Cir.1975)). *See*

---

**12.** The Court questions, but need not decide in this case, whether the 25 percent benchmark should be abandoned in securities fraud cases.

**13.** Plaintiffs' counsel argue that applying the lodestar method would completely undermine the rationale for using the percentage method. Counsel's argument is without merit. The Ninth Circuit has expressly held that "there is no necessary correlation between any particular percentage and a reasonable fee." *WPPSS*, 19 F.3d at 1297. Attorneys are

entitled to be rewarded for taking the risk of nonpayment, but they are not entitled to a windfall. Counsel further contend that the Third Circuit has criticized the lodestar method. However, the Ninth Circuit has stated that the lodestar method may be used to calculate a reasonable fee. *Graulty*, 886 F.2d at 272.

**14.** In *Vizcaino*, the court reached its determination based on a survey of class actions involving common funds of $50–200 million. 290 F.3d at 1050 n. 4.

*also Critical Path,* 2002 WL 32627559, at *9–11, 2002 U.S. Dist. LEXIS 26399, at *31–33 (after finding that most securities fraud cases settle and that a low risk multiplier was proper, the court found multipliers of 3.7 and 1.3 to be reasonable); *In re Cendant Corp., PRIDES Litig.,* 243 F.3d 722, 742 (3d Cir.2001) (noting that an acceptable multiplier range is 1.35 to 2.99); *In re Sumitomo Copper Litig.,* 74 F.Supp.2d 393, 399 (S.D.N.Y.1999) (multipliers of between 3 and 4.5 have been common in federal securities cases); *Behrens v. Wometco Enter., Inc.,* 118 F.R.D. 534, 549 (S.D.Fla.1988) (multiplier in federal securities of 3 to 4 common) (citing multiple cases).

The total number of hours spent by the attorneys in *Vizcaino* was 17,787; an additional 6,104 hours were worked by non-lawyer staff, resulting in a lodestar of $7,386,876. 142 F.Supp.2d at 1305. The court determined that a 28 percent fee was reasonable, resulting in a multiplier of 3.67.[15]

### 1. Adjustment of the Lodestar

Counsel have calculated a lodestar of $1,252,364.75. This represents 4,172.9 hours of work.[16] The Court finds that a reduction in the lodestar is necessary to accurately reflect the amount and value of the legal hours spent on procuring this settlement.

### a. Reasonable Hourly Rate

An essential element of calculating the lodestar is determining a reasonable hourly rate for the attorneys. The Court believes that a reduction in the reported rates of some of the attorneys is necessary to reflect the value that certain lawyers could be expected to add to the litigation. Specifically, the hourly rates charged by four attorneys in the firm of Milberg Weiss Bershad Hynes & Lerach LLP ("Milberg Weiss") should be adjusted. Randi Bandman is a partner with little to no trial experience; Ms. Bandman listed an hourly rate of $500. In a previous securities litigation before this Court in 2002, Ms. Bandman had listed an hourly rate of $420, and this Court reduced the rate to $325. *In re Boeing Sec. Litig.,* C97–1715Z (W.D. Wash. April 10, 2002) (Order awarding fees). For purposes of calculating the lodestar, the Court believes that an hourly rate of $325 for Ms. Bandman is also appropriate here. Joy Ann Bull is a partner, and she has listed an hourly rate of $460. However, Mr. Berman, who is the managing partner at Hagens Berman LLP ("Hagens Berman") and a very experienced class action litigator, has listed an hourly rate of $425. The Court believes that Ms. Bull's rate should be reduced to $425. The Court also believes

**15.** In *Critical Path,* the class had settled for $17.5 million. 2002 WL 32627559, at *3–4, 2002 U.S. Dist. LEXIS 26399, at *11. One firm had requested and was awarded 15 percent of the settlement fund, falling well below the 25 percent benchmark and resulting in a lodestar multiplier of 3.2. *Critical Path,* 2002 WL 32627559, at *9–10, *10–11, 2002 U.S. Dist. LEXIS 26399, at *31, *33. The court found this reduction to be proper because there was only a *modest* risk to recovery ("most securities fraud cases settle"), and the bargain made fell on the low end of reasonableness. *Id.,* 2002 WL 32627559, at *9–10, 2002 U.S. Dist. LEXIS 26399, at *31–32. The court also found that counsel's efforts primarily occurred in a brief two-month period and that the work undertaken was not particularly complex; "few novel issues were raised." *Id.,* 2002 WL 32627559, at *10, 2002 U.S. Dist. LEXIS 26399, at *32.

**16.** The total number of hours worked by the law firm of Hagens Berman LLP is 1,060.50. Berman Decl., docket no. 122, ¶ 4. The total number of hours worked by Milberg Weiss Bershad Hynes & Lerach LLP is 2,257.25. Bull Decl., docket no. 123, ¶ 4. The total number hours spent on this litigation by Schiffrin & Barroway, LLP is 855.15. Barroway Decl., docket no. 124, ¶ 4.

that the hourly rate of Patrick Coughlin should be reduced from $635 to $500. The reduction of Ms. Bandman's, Ms. Bulls', and Mr. Coughlin's hourly rate also warrants the reduction of Mr. Egler's hourly rate from $335 to $300. These adjustments reduce the lodestar by a total amount of $55,206.25.

### b. Merrill Lynch Litigation

In calculating the initial lodestar, Hagens Berman included 53.4 hours that it spent researching Merrill Lynch and Henry Blodgett's involvement in the alleged false and misleading information disseminated during the class period. Berman Decl., docket no. 122, ¶ 6. The case against Merrill Lynch has been transferred to the Southern District of New York.[17] Plaintiffs' counsel represented to the Court during oral argument that the case against Merrill Lynch is still pending in New York and that a request for fees will be made upon resolution of the case. Accordingly, a payment of fees resulting from litigation with Merrill Lynch is not appropriate in this case. The total lodestar should be reduced by the amount spent on the Merrill Lynch case, $12,837.50.

### c. Reasonable Hours

■ Plaintiffs' counsel have reported 4,172.9 hours of legal work. The Court does not consider this number to be unreasonable, but the number of hours reported encompasses the efforts of 29 separate attorneys. The Court believes that duplication of effort and inefficiency is inevitable when 29 attorneys report time on a single action that did not make it beyond the limited pleading stage.[18] The Court believes that a modest reduction of 5 percent is appropriate to discount for duplication and inefficiency. A 5 percent discount, taken after making the reductions discussed above, results in a reduction of $59,216.05.

### 2. Lodestar Multiplier

■ After making all of the adjustments, the new lodestar is $1,125,104.95.[19] An award of 25 percent of the net settlement, $8,456,353.94, would result in a multiplier of 7.5. A multiplier of 7.5 is not reasonable under the circumstances of this case.

### a. Work Required

Plaintiffs' counsel have been pursuing this case for approximately two-and-a-half years. This case began in June 2001, and the settlement was signed in February 2004. Plaintiffs' counsel engaged in only limited work to investigate the claims and the defenses asserted by Defendants in their motion to dismiss. The first motion to dismiss was not filed until April 8, 2002; the second was filed on July 2, 2002. Plaintiffs' counsel did not file or prepare a response to these motions. No other dispositive motions were filed with the Court. Additionally, no interrogatories, requests for production, or notices of depositions were filed with the Court. Prior to the settlement conference, counsel's efforts were focused primarily on investigation of the claims and defenses. The amount of time and effort exerted by counsel was not extensive and does not support a substantial multiplier.

---

17. Counsel have also included the hours relating to opposing the motion to remove, the severance issues, the motion to remand, and the related hearings. Berman Decl., docket no. 122, ¶ 6.

18. Notably, Defendants did file a motion to dismiss, but a response was never prepared or filed. No discovery occurred in this case.

19. The original lodestar ($1,252,364.75) less Bandman reduction ($18,943.75), less Bull reduction ($3,937.50), less Coughlin reduction ($5,130), less Egler reduction ($27,195), less Merrill Lynch fees ($12,837.50), less 5 percent efficiency reduction equals $1,125,104.95.

### b. Skill Required and the Skill of the Attorneys

This was a garden variety securities case that did not present novel issues of law. According to counsel, the investigation of this case was conducted by associates. Mr. Egler, who reported 777 hours of work, was an associate when the case started and became a partner while the case was pending. Mr. Egler "took primary responsibility for day-to-day case management" and conducted much of the investigation. Bull Decl., docket no. 123, ¶ 5. Mr. Egler drafted pleadings; interfaced with investigators, forensic accountants, damage consultants, counsel in other actions against Defendants, and lead Plaintiffs; reviewed InfoSpace's disclosures; researched InfoSpace's business sector; and reviewed reports. *Id.* The efforts and work completed by counsel in investigating this case could not have been that difficult because, as Plaintiffs' counsel explained during oral argument, the entire management of the case was entrusted to an associate, who later became a junior partner.[20]

### c. Risk of Nonpayment

Plaintiffs' counsel contend that a multiplier of 6.75 to 10 would be required to adequately compensate counsel's risk of nonpayment. Pl. Mot., docket no. 120, pg. 10; Pl. Reply, docket no. 145, pg. 5. Plaintiffs' counsel submit several cases in which a larger lodestar multiplier was applied. Notably, the district court in *Vizcaino* had

considered similar and identical cases cited by Plaintiffs' counsel here, but concluded that, based on the circumstances of the case, a multiplier of 3 or 4 was justified.[21] 142 F.Supp.2d at 1306. Additionally, in *In re Cendant*, the Third Circuit noted that a lodestar multiplier of 3 was applied in cases where an extensive amount of work was invested in the case. 243 F.3d at 742.

The amount of hours worked in this case is substantially less than those worked in *Vizcaino*, and the risk of nonsuccess is comparable, if not less. In *Vizcaino*, the case was extremely risky for class counsel because twice plaintiffs lost in the district court and twice succeeded on appeal. 290 F.3d at 1048. Additionally, the case was pursued in the absence of supporting precedence, in the face of agreements signed by class members forfeiting benefits, and Microsoft's opposition. *Id.*

In this case, Plaintiffs' counsel contend that the risk of no recovery in securities fraud cases is significant and that most cases end in dismissal of the complaint. Counsel argue that they had serious doubts regarding whether they would survive a motion to dismiss. As discussed previously, most securities fraud cases settle, this was not a complex matter, and the risks associated with this litigation were no greater than the risk presented in any other securities action. There was only a modest risk to recovery; a large multiplier is not warranted.[22]

---

**20.** Mr. Egler graduated from law school in 1995 and finished his clerkship in 1997. Bull Decl., docket no. 123, Ex. A.

**21.** In *Weiss v. Mercedes–Benz of N. Am., Inc.*, 899 F.Supp. 1297, 1304 (D.N.J.1995), the court did not address multipliers or lodestars; it only considered the reasonableness of a 15 percent fee. Similarly, in *Rite Aid I*, the court applied the percentage method and found that "the average percentage of settlements between $100 million and $200 million is 28.1%." *Rite Aid*, 146 F.Supp.2d at 735–36. Consequently, the court approved the 25 per-

cent fee award of a $193 million settlement. *Id.* Finally, in *Roberts v. Texaco, Inc.*, 979 F.Supp. 185, 197 (S.D.N.Y.1997), the court noted that the case involved extraordinary skill and a substantial risk of nonrecovery. The result achieved also drew national attention. *Id.* The court noted that a lodestar multiplier of 2 to 5 is typically applied, but that the circumstances of the case warranted a multiplier of 5.5. *Id.* at 198.

**22.** In a previous securities class action in which Hagens Berman and Milberg Weiss were acting as class counsel, the case settled

Additionally, an extensive amount of work has not been invested in this case. The case never progressed beyond the pleading stage; counsel's efforts were limited to drafting complaints and conducting investigations. A motion to dismiss was filed, but counsel never responded to the motion. The Court finds a lodestar multiplier of 3–4 more than adequately compensates counsel's risk of nonpayment. The Court will apply a 3.5 multiplier, and Plaintiffs' counsel are entitled to a fee award of $3,937,867.32, which is almost 12 percent of the settlement fund, net expenses.

### C. Expenses

■■■ Plaintiffs' counsel also request reimbursement for their litigation expenses from the common fund. Counsel in common fund cases may recover those expenses that "would normally be charged to a fee paying client." *Harris v. Marhoefer*, 24 F.3d 16, 19 (9th Cir.1994) (quotations and citations omitted). The PSLRA also permits an award of expenses in securities litigation cases. *See* 15 U.S.C. § 78u–4(a)(6). Counsel have requested $474,584.23 in litigation expenses. The Court finds this to be a reasonable amount.

### D. Class Representatives

■■■ Lead Plaintiffs Amir Heshmatpour and Ronald Wyles on behalf of Coastline Corporation Ltd. have requested reimbursement of their costs and expenses. A court may award "reasonable costs and expenses (including lost wages) directly relating to the representation of the class to

any representative serving on behalf of the class." 15 U.S.C. § 78U–4(a)(4). Amir Heshmatpour requests $5,000, and Ronald Wyles requests $6,600. The Court finds these amounts to be reasonable.

### CONCLUSION

The Court hereby GRANTS in Part and DENIES in Part counsel's motion for fees, docket no. 120. The Court awards Plaintiffs' counsel $3,937,867.32 in attorneys' fees and $474,584.23 in litigation costs from the settlement fund. This total award reasonably compensates counsel for the amount of time and effort invested in the case, the complexity of the work performed, and the risk associated with the litigation. The Court also awards $5,000 to Amir Heshmatpour and $6,600 to Ronald Wyles on behalf of Coastline Corporation Ltd. as reimbursement for the costs and expenses they incurred as lead plaintiffs.

IT IS SO ORDERED.

for $92.5 million in cash. Counsel were awarded a 25 percent fee award of the net common fund. *In re Boeing Sec. Litig.*, C97–1715Z, (W.D. Wash. April 10, 2002) (Order awarding fees). In that case, 133 attorneys had reported over 68,000 hours of combined effort. Class counsel had requested a fee award of 30 percent of the net common fund, which produced a lodestar multiplier of 1.35.

In *Boeing*, the class counsel had responded to and survived two motions to dismiss and two motions for summary judgment. A lodestar cross-check revealed that a 25 percent award provided a 1.476 multiplier of the lodestar; the multiplier had increased after adjustments had been made to the net recovery and to the initial lodestar.